FILED

10/23/2018

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 1, 2018

IN RE NATASCHA B.

Appeal from the Juvenile Court for Humphreys County
No. J-11717-16      Anthony L. Sanders, Judge

_____

No. M2018-00247-COA-R3-PT

_____

A father appeals the termination of parental rights to his daughter. The juvenile court found three statutory grounds for termination: abandonment by willful failure to visit, abandonment by willful failure to support, and substantial noncompliance with the requirements of the permanency plans. The court also found that termination of the father's parental rights was in the child's best interest. On appeal, DCS declines to defend the ground of abandonment by willful failure to visit. We conclude that the evidence was less than clear and convincing as to all of the statutory grounds found with respect to the father. Thus, we reverse the termination of the father's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which THOMAS R. FRIERSON II and ARNOLD B. GOLDIN, JJ., joined.

Taylor Luther, Dickson, Tennessee, for the appellant, Kevin F.

Herbert H. Slatery III, Attorney General and Reporter, and W. Derek Green, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I.**

Six days after Natascha B.'s birth in March 2015, the Tennessee Department of Children's Services ("DCS") filed a petition for temporary legal custody and to declare her dependent and neglected. The petition alleged, among other things, that Natascha's mother, Danarae J. ("Mother"), had "significant mental health problems which

significantly impair[ed] her ability to safely care for this child." The petition also alleged Benjamin B., Mother's boyfriend, had "significant mental health problems and a significant prior abuse charge." Although Natascha's birth certificate named Benjamin B. as her father, the petition named as respondents Mother, Benjamin B., and Jamie W., another possible biological father of Natascha.

On the day the petition was filed, the court entered an order granting DCS temporary custody of Natascha. DCS placed Natascha in a foster home.

On April 15, 2015, DCS amended its petition to add Kevin F. ("Father") as a respondent, alleging that Mother had identified him as Natascha's biological father. But at an adjudicatory hearing held in July, Mother stated she no longer believed Father to be the biological father. Rather, she named Jamie L. as a possible biological father.

The court found Natascha to be dependent and neglected based on Mother's stipulation and the record. And the court ordered Father to submit to paternity testing. The testing later confirmed Father's parentage.

Following the adjudicatory hearing, the court transferred the case to the Juvenile Court for Humphreys County, Tennessee, and all further proceedings took place there. The juvenile court approved five family permanency plans related to Natascha, but due to the questions surrounding parentage, not all of them were created with Father's participation.

On May 3, 2016, DCS filed a petition to terminate the parental rights of Mother, Benjamin B., Jamie L., Jamie W., and Father. Specifically as to Father, the petition alleged as grounds for termination abandonment by willful failure to visit, abandonment by willful failure to support, substantial noncompliance with the requirements of the permanency plans, and failure to establish paternity or exercise parental rights.

Although he was named in the petition for termination of parental rights, Father seemingly was making strides in establishing a relationship with Natascha. At a review hearing held on August 23, 2016, DCS advised the court that Father had been having supervised visits with Natascha for four hours per week and that those visits had gone well. DCS requested that Father's visitation be at its discretion so that the visitation could be "increased to overnight visits leading up to a trial home visit." The court granted Father eight hours of unsupervised visitation each week and ordered additional visitation as agreed.

At a review hearing held on October 11, 2016, DCS advised the court that Father had been exercising the previously awarded unsupervised visitation and that the visits had gone well. DCS requested that Father have forty-eight hour overnight visitation with Natascha. And the court granted the request.

The overnight visits marked the beginning of several concerns about Father. DCS claimed "environmental issues" with Father's home and expressed "concern[] for [Natascha's] safety and well-being in the home until services beg[a]n working in the home to address the issues."[1] News also came of Father's arrest for violation of the sex-offender registry law. *See* Tenn. Code Ann. §§ 40-39-201 to -218 (2014 & Supp. 2017). Approximately fourteen years prior, Father had pled guilty to a sexual abuse offense in Oregon.

In light of these developments, DCS requested that Father's visitation be modified to not occur in his home until the environmental issues were addressed. The court agreed and ordered Father to have unsupervised visitation "to occur in the community" every week pending further order.

At a subsequent hearing held on November 29, 2016, the court considered a request by Father to reinstate overnight visitation. The court found that Father "ha[d] made progress, but [wa]s still not where he need[ed] to be in this matter." The court set Father's request for an evidentiary hearing and ordered DCS to "furnish a list to [Father and his wife] of what need[ed] to be done to get their home up to appropriate standards for visitation to occur in the home." The court also ordered that "[t]his list shall be filed with the Court and disseminated to all appropriate parties."

In February 2017, DCS requested that Father's visitation be modified to supervised due to Father's incarceration. Father had been jailed for possession of one-half ounce of marijuana. The court instead suspended Father's visitation.

At the time of his February arrest, Father had been on probation stemming from a March 2016 guilty plea to two counts of misdemeanor theft. The drug offense arrest violated his probation, so Father was ordered to serve thirty days in jail. Between April and June 5, 2017, Father spent another sixty-one days in jail stemming from a 2014 sex-offender registry violation.

After a one-day trial in September 2017, the juvenile court entered its written findings of fact and conclusions of law in a memorandum opinion. In a subsequent order, the court terminated Mother's and Father's parental rights.[2] As to Father, the court concluded that there was clear and convincing evidence that he abandoned Natascha by failure to visit and support and of substantial noncompliance with the requirements of the

---

[1] At trial, the DCS caseworker testified she was concerned about the clutter in Father's two-bedroom apartment, which he shared with his wife, their four children, and four dogs.

[2] The juvenile court granted a default judgment against Benjamin B., Jamie L., and Jamie W.

3

permanency plans. The court also concluded that there was clear and convincing evidence that termination was in Natascha's best interest. Only Father appealed.

## II.

A parent has a fundamental right, based in both the federal and State constitutions, to the care and custody of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995). But parental rights are not absolute. *In re Angela E.*, 303 S.W.3d at 250. Our Legislature has identified those situations in which the State's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth the grounds upon which termination proceedings may be brought. *See* Tenn. Code Ann. § 36-1-113(g) (2017).

Tennessee Code Annotated § 36-1-113 sets forth both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 544 (Tenn. 2015). First, parties seeking termination of parental rights must prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated § 36-1-113(g). Tenn. Code Ann. § 36-1-113(c)(1). If one or more statutory grounds for termination are shown, they then must prove that terminating parental rights is in the child's best interest. *Id.* § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *Id.* "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

On appeal, we review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); Tenn. R. App. P. 13(d). We then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de

4

novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

A.

On appeal, Father challenges each of the grounds found for termination of his parental rights. Specifically, Father argues that DCS failed to prove each of the grounds by clear and convincing evidence.

1. Abandonment

One of the statutory grounds for termination of parental rights is "[a]bandonment by the parent." Tenn. Code Ann. § 36-1-113(g)(1). The General Assembly has provided "five alternative definitions for abandonment as a ground for the termination of parental rights." *In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005); *see also* Tenn. Code Ann. § 36-1-102(1)(A) (2017) (defining the term "abandonment").[3] Abandonment, under Tennessee Code Annotated § 36-1-102(1)(A)(i), "is defined as the willful failure to visit, to support, or to make reasonable payments toward the support of the child during the four-month period preceding the filing of the petition to terminate parental rights." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013); *see also* Tenn. Code Ann. § 36-1-102(1)(A)(i). Here, because the petition was filed on May 3, 2016, the relevant four-month period is January 3, 2016, to May 2, 2016. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (concluding that the day before the petition is filed is the last day in the relevant four-month period).

To terminate parental rights on the ground of abandonment, the court must find the abandonment to be willful. While the failure of the parent to visit or support presents a question of fact, "[w]hether a parent's failure to visit or support constitutes willful abandonment . . . is a question of law." *In re Adoption of Angela E.*, 402 S.W.3d at 640 (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810). "Failure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *In re Audrey S.*, 182 S.W.3d at 864.

On appeal, DCS concedes that there was "insufficient evidence in the record regarding Father's visitation during the four months preceding the filing of the petition to

---

[3] The general assembly recently enacted an amendment, effective July 1, 2018, that did away with the requirement that the petitioner prove willfulness on the part of the parent whose parental rights are at issue. 2018-2 Tenn. Code Ann. Adv. Legis. Serv. 174 (ch. 875, § 2) (Lexis/Nexis) The parent may assert the absence of willfulness as an affirmative defense, which he or she must establish by a preponderance of the evidence. *Id.* Because the termination petition was filed prior to the effective date, we have applied the pre-amendment version.

terminate Father's parental rights." After reviewing the record, we agree. Once DNA testing in late 2015 confirmed Father to be the biological father of Natascha, Father maintained consistent visitation with Natascha throughout 2016.

We next consider whether the juvenile court erred in finding by clear and convincing evidence the ground of abandonment for willful failure to support. A parent's failure to support a child is not willful if the parent is financially unable to do so. *In re Aaron E.*, No. M2014-00125-COA-R3-PT, 2014 WL 3844784, at \*6 (Tenn. Ct. App. Aug. 4, 2014). In making a willfulness determination, the court must review a parent's means, which includes both his income and available resources for purposes of support. *See In re Adoption of Angela E.*, 402 S.W.3d at 641.

Here, DCS presented proof that Father worked during the relevant time period and that he did not pay any child support. But there was no proof as to his income and expenses during the same period.[4] *See id.* (concluding that petitioners failed to prove the ground of willful failure to support because "[t]he evidence concerning [the parent's] income and expenses [wa]s limited at best"). On this record, we cannot conclude that the evidence is clear and convincing that the failure to support was willful because DCS failed to establish that Father had the ability to pay support.

2. Substantial Noncompliance with the Requirements of the Permanency Plan

Finally, the juvenile court found Father was "not in substantial compliance with the tasks on the Permanency Plan." *See* Tenn. Code Ann. § 36-1-113(g)(2). Before analyzing whether a parent complied with the permanency plan, the court must find that the permanency plan requirements that the parent allegedly failed to satisfy are "reasonable and are related to remedying the conditions that necessitate foster care placement." Tenn. Code Ann. § 37-2-403(a)(2)(C) (2014); *see also In re Valentine*, 79 S.W.3d at 547. "Conditions necessitating foster care placement may include conditions related both to the child's removal and to family reunification." *In re Valentine*, 79 S.W.3d at 547.

We agree with the juvenile court that the requirements of the permanency plans were reasonable and related to remedying the conditions that necessitated foster care. Father had several responsibilities under the permanency plans. As might be expected, one of the goals of the first permanency plan was to identify Natascha's biological father. So the plan required Father to establish paternity. Once paternity was established, the plan required Father to contact DCS to be added to the plan and to participate in the permanency plan by, among other things, visiting. The plan also required Father to

---

[4] The guardian ad litem asked Father some questions about his expenses and income as of the day of trial.

provide DCS with updated releases of information for background checks and with reliable methods of contact. Requirements added later included allowing DCS to conduct a walkthrough of Father's home so that its safety and appropriateness for placement of Natascha could be confirmed, having a parenting assessment and following all recommendations, "follow[ing] all laws about being on the sex offender registry," providing DCS with proof of a legal source of income, contacting a permanency specialist to discuss placement options for permanency, and continuing in-home services to address environmental concerns in Father's home.

Next, we must determine whether Father's noncompliance was substantial in light of the importance of the requirements to the overall plan. *See In re Valentine*, 79 S.W.3d at 548-49. "Substantial noncompliance is a question of law which we review de novo with no presumption of correctness." *Id.* at 548. A "[t]rivial, minor, or technical" deviation from the permanency plan's requirements does not qualify as substantial noncompliance. *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). Our focus is on the parent's efforts to comply with the plan, not the achievement of the plan's desired outcomes. *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *8 (Tenn. Ct. App. Mar. 2, 2009). We review the court's findings of fact concerning compliance with the requirements of the permanency plan de novo with a presumption of correctness. *See In re Valentine*, 79 S.W.3d at 547.

The court found that Father "was . . . aware of tasks he needed to complete on the permanency plan and that he continue[d] to have environmental issues on and off in his home." But fixing specific "environmental issues" was not a plan requirement. Rather, the January 2017 plan required Father to "continue in-home services to address the environmental concerns in [his] home" and "allow DCS to conduct a walkthrough of the home to check for the safety and appropriateness for placement of Natascha." As we have previously stated, if a parent is to be held to a plan requirement, "then the permanency plan should clearly communicate to the parent: this is what you must do to regain custody of your child." *In re Abigail F.K.*, No. E2012-00016-COA-R3-JV, 2012 WL 4038526, at *13 (Tenn. Ct. App. Sept. 14, 2012).

DCS does not dispute that Father used in-home services or permitted walkthroughs of his home. Instead, DCS argues that Father made "no major improvements to [his] home and . . . that the issues that existed when the court ordered Father to clean up his home in January 2017 had not been resolved." While the court ordered DCS to furnish Father with a list of specific things that he needed to fix regarding his home even before the creation of the January 2017 plan, DCS did not incorporate these tasks into a permanency plan. The list itself was not included in the record on appeal, and at trial, the DCS caseworker could not recall all of the items on the list.

Even if we were to consider items on the list that could be recalled, the evidence showed that Father attempted to comply with the items. On cross-examination, the DCS

caseworker admitted that clothes had been removed from the furniture and off the floor, the children's toys were confined to the children's bedroom, the kitchen countertops were either clear or held very few dishes, no trash was observed in any of the rooms, no cockroaches were observed in the home, there were no safety concerns with a baby gate that was erected, and pills were put away out of the reach of the children. She also testified that Father had "been very cooperative and understanding and willing to work towards" providing a safe home.

Other than as discussed above, the juvenile court made no findings regarding Father's failure to meet plan requirements. On appeal, DCS maintains that there were three requirements, actually set forth in a permanency plan, that Father failed to accomplish and which should be considered. Specifically, DCS claims Father failed to provide DCS with proof of a legal source of income, to visit with Natascha, and to comply with the sex-offender registry.

As to proof of a legal source of income, the record contains no evidence that Father's lack of resources was ever a concern. The January 2016 plan noted under the heading of "Child and Family Strengths" that Father and his wife "are able to meet the needs of their children" and discussed the possibility of the couple adopting another of Mother's children. The DCS caseworker who testified at trial admitted she never asked for any wage information[5] from Father and was unsure whether anyone ever attempted to obtain this information from him. And Father testified DCS never gave him the promised email address so that he could provide a copy of his pay stubs via email.

Under these circumstances, we conclude Father's failure to provide DCS with his pay stubs was a "[t]rivial, minor, or technical" deviation from the permanency plan's requirements. *See In re M.J.B.*, 140 S.W.3d at 656. As such, we assign little weight to Father's lack of compliance with this requirement.

As to visitation with Natascha, the DCS caseworker testified that Father "was having consistent visitation in 2016; and in 2017, there w[ere] quite a few canceled or missed visits." Natascha's foster parent explained the canceled and missed visits as follows:

> It was during . . . [the] pregnancy [of Father's wife]. And there were a lot of days when she was having difficulties with the pregnancy, and last minute they would cancel because of that. A couple of times they just didn't show, and we waited around until we finally got ahold of them, and they had overslept or for one reason or another. There were a few

---

[5] Father's counsel actually asked the DCS caseworker about a wage "assignment," but the context of the question suggests that counsel was inquiring about DCS's efforts to obtain income information from Father.

occasions where the kids were sick, and we coordinated that it wasn't in the best interests of any of them to be together and share the sickness.

In February 2017, following Father's arrest, the court suspended his visitation altogether. Although Father attempted to have his visitation reinstated after his release, the court denied the request in light of the impending trial on the parental termination petition.

Based on this record, Father did not fully comply with the visitation requirement. Certainly some of Father's missed visitation was understandable under the circumstances. But Father also erected barriers to visitation by not obeying the law and by not maintaining a clean and sanitary home environment.

The requirement that Father "follow all laws about being on the sex offender registry" first appeared in the second permanency plan dated November 19, 2015. Although there was no testimony regarding the rationale for the addition of this requirement, Father admitted to failing to register as a sex offender upon moving to Tennessee. When that offense was ultimately resolved by Father, the judgment showed the offense date as July 24, 2014, so presumably DCS was aware of this outstanding charge either as a result of Father's disclosure or through a background check when the second permanency plan was formulated.

At trial, Father, now 32, offered some background on the original sex abuse charge. He testified that he was arrested as a juvenile on "a sex abuse charge" and that he pled guilty to the charge at age 18 or 19. He claimed that he had "all of the treatment needed for it, all of the polygraphs needed for it, and completed the treatment in Oregon." He further claimed that he had "petitioned to get off the registry," presumably in Oregon. He attributed his failure to register to the differences in the laws between the two states.

The failure to register offense predated both Natascha's birth and the creation of all the permanency plans. But DCS argues that we should rely on this offense plus a more recent charge. Father allegedly ran afoul of the sex-offender registry law again.

In February 2017, a grand jury indicted Father on two counts: failure to obtain a valid driver license or photo identification card and failure to provide a complete listing of his electronic mail address information or any instant message, chat or other Internet communication name or identity that he used or intended to use. *See* Tenn. Code Ann. §§ 40-39-203(i)(17), -213(a). Although he did admit to not having a Tennessee driver license, Father was not asked about the outcome or status of the more recent charges. Father testified that he was on probation for failure to register, but the probation may have related to the original charge.

On this record, even taking into consideration plan requirements not addressed in the order terminating parental rights, we cannot conclude that Father's noncompliance

9

was substantial. The record supports a finding that Father failed to provide DCS proof of income. But Father's failure was not substantial in light of the requirement's importance to the overall plan. *See In re Valentine*, 79 S.W.3d at 548-49.

Once he established paternity, the plan required Father to participate in visitation, certainly an important requirement. But although Father had not visited in nine months at the time of trial, a substantial amount of that time, sixty-one days, Father spent in jail as a consequence of an offense that occurred prior to Natascha's birth. Presumably, DCS anticipated that Father would address the prior charge. Once he served his sentence, Father moved to reinstate visitation. The court denied the request in light of the pending petition for termination of parental rights.

The alleged noncompliance with the sex-offender registry law was and is troubling. At the time of trial, however, there were only charges. DCS failed to establish that Father had not complied with the sex-offender registry law after that requirement was added to the permanency plan. We decline to rely on the offense that occurred prior to Natascha's birth and the creation of any permanency plan to support the ground of substantial noncompliance with the permanency plan requirements.

In our analysis, we also consider Father's efforts in complying with the permanency plan requirements. Father established paternity, participated in the permanency plan, provided DCS with releases and reliable methods of contact, completed a parenting assessment, used in-home services, and permitted walkthroughs of his home.[6] And Father consistently visited during 2016 and took steps to do so in 2017 after resolving some of his legal troubles.

To be certain, Father still has much work to do. Despite his efforts, Father has not yet shown he can provide a home suitable for Natascha. And his new legal troubles may defeat his efforts to maintain a relationship with the child. But here the evidence of substantial noncompliance with the permanency plan by Father was less than clear and convincing.

### B.

To terminate parental rights, at least one of the statutory grounds for termination listed in Tennessee Code Annotated § 36-1-113(g) must be established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c)(1). As DCS failed to prove by clear and convincing evidence a statutory ground for termination of Father's parental rights, we do not reach the issue of whether termination of Father's parental rights was in

---

[6] In a footnote in its brief, DCS states that "[t]here is nothing in the record regarding Father's compliance with the parenting assessment." But Father testified he completed the assessment, and this proof went uncontradicted.

the child's best interest.  *See In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017) (requiring that the party seeking to terminate parental rights prove by clear and convincing evidence both a ground for termination and that termination is in the child's best interest).

## III.

Based on the foregoing, we reverse the judgment of the juvenile court terminating Father's parental rights.

_____
W. NEAL MCBRAYER, JUDGE